UNITED STATES DISTRICT COURT

Northern District of California

San Francisco Division

| | |
|---|---|
| WILLIAM SCHWARZ,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>UFCW-NORTHERN CALIFORNIA EMPLOYERS JOINT PENSION PLAN,<br><br>　　　　　Defendant.<br>_____/ | No. C13-00977 LB<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Re: ECF No. 27] |

## INTRODUCTION

Plaintiff William Schwarz sued Defendant UFCW-Northern California Employers Joint Pension Plan (the "Plan") to recover disability benefits to which he claims he is entitled. *See generally* Complaint, ECF No. 1.[1]  The Plan now moves for summary judgment. The court heard oral argument from the parties on January 16, 2014. Having considered the administrative record, the parties' summary judgment briefs, and the arguments made at the January 16, 2014 hearing, the court **GRANTS** the Plan's motion for summary judgment.

## STATEMENT

### I. THE PLAN AND ITS BOARD OF TRUSTEES

The Plan was created to provide retirement benefits for employees who work in the retail food

---

[1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronically-generated page numbers at the top of the document.

industry. *See* UFCW 0001-0076 (Plan Document); UFCW 0077-0098 (Amendments to the Plan Document); UFCW 0099-0150 (Summary Plan Description); UFCW 0163-0266 (Trust Agreement).[2] It was established by a Plan Document and Trust Agreement, pursuant to various collective bargaining agreements between local United Food & Commercial Workers ("UFCW") unions and retail food industry employers in California. *See* UFCW 0001-0098 (Plan Document and Amendments), 0105 (Introduction to Summary Plan Document), 0142 (participating UFCW union locals), 0150 (logos of some of the participating employers), 0165-0166 (Introduction to Trust Agreement). It is a multi-employer, Taft-Hartley plan. *See* UFCW 0105, 0142, 0150; 0165-0166; 29 U.S.C. § 186(c)(5).[3]

The Plan is governed by a Board of Trustees that consists of Employer Trustees and Union Trustees, with each side having an equal vote on all matters. UFCW 0006, 0045, 0104, 0167, 0169-0172, 0196-0197. The Board of Trustees has discretionary authority to determine eligibility for benefits and construe the terms of the Plan. UFCW 0006, 0045, 0104, 0167, 0172. The Plan Document specifically provides that

> [t]his Plan and the Trust Fund shall be administered by the Board appointed under the Trust Agreement. The Board shall have all powers specifically given it by the Trust Agreement and all other powers reasonably necessary in the administration of the Plan. <u>Discretionary authority is vested with the Board of Trustees to determine eligibility for benefits under this Plan and to construe the terms of this Plan and any Rules, Regulations, and/or Procedures adopted to administer the Plan.</u>

UFCW 0045 (emphasis added). The Plan's Summary Plan Description also makes clear that only the Board of Trustees is "authorized to interpret the Plan" and that the "Trustees of the Pension Plan . . . have the sole discretion to decide all questions about the Plan, including questions about your eligibility for benefits and the amount of any benefits payable to you." UFCW 0104.

---

[2] Citations in the format "UFCW ____" refer to the Bates-stamped page number of the Amended Administrative Record filed in the record by the Plan on October 15, 2013. *See* Amended Administrative Record, ECF No. 26.

[3] The criteria for a Taft–Hartley plan are set forth in § 302 of the Taft-Hartley Act, 29 U.S.C. § 186(c)(5). It must be established for the sole and exclusive benefits of the employees; payments must be made to it by employers; there must be a written agreement with the contributing employers; the "employees and employers must be equally represented in the administration of such fund"; and there be a deadlock procedure.

## II. THE PLAN WAS DETERMINED TO BE IN CRITICAL STATUS IN 2010 AND 2011

On March 31, 2010, based on funding problems, liquidity problems, or both, the Plan's actuary determined that the Plan was in "critical status" under the Pension Protection Act of 2006 ("PPA"), Pub. L. 109-280, 120 Stat. 780 (2006), for the Plan Year beginning January 1, 2010. UFCW 0267-0268; *see* 29 U.S.C. § 1085(a) & (b)(2). Under the PPA, because of this critical status determination, the Plan was required to adopt a Rehabilitation Plan to restore its financial health. UFCW 0267-0268; *see* 29 U.S.C. § 1085(e). The PPA required the Plan to make changes to benefits and contributions. A surcharge was imposed on all contributing employers until they adopted one of the schedules under the Rehabilitation Plan, with a 5% surcharge imposed in 2010, and a 10% surcharge imposed beginning in 2011. UFCW 0267-68; 0269-0270.

The next month, in April 2010, a notice was sent to all Plan participants informing them that the Plan was in critical status. UFCW 0267-0268. The notice alerted participants that the Plan was required by federal law to adopt a Rehabilitation Plan, and specifically warned that adjustable benefits, including "Disability Retirement Benefit[s] (not yet in pay status)," might be reduced or eliminated. *Id.*

The Plan's Trustees adopted a Rehabilitation Plan on July 8, 2010. *See* UFCW 0078. The Board of Trustees explained in a letter to participants that

> the ongoing impact of the worldwide economic crisis has required virtually all defined benefit pension plans to take measures to improve their funding status. This is because a large part of the income used to pay pension benefits is the interest (or income) generated by investing Pension Fund assets. While the investment returns for our Plan have been better than anticipated over the last two years, we have not yet been able to overcome the effects of the significant losses in 2008.

UFCW 0329. The Trustees explained that changes being implemented "will assist in helping the Fund meet its obligations both now and in the future." *Id.*

The Plan remained in critical status for the Plan Year beginning January 1, 2011. UFCW 0269-0270. In April 2011, a second notice was sent to all participants informing them of the Plan's critical status and that a Rehabilitation Plan had been adopted. *Id.* Like the April 2010 notice, the April 2011 notice specifically warned that adjustable benefits, including "Disability Retirement Benefit[s] (not yet in pay status)," might be reduced or eliminated. *Id.* The notice explained that the

reductions would not affect individuals who retired before May 1, 2010. *Id.* The notice specifically stated that reductions in benefits would apply to participants whose benefit commencement date was on or after January 1, 2012. *Id.*

## III. THE BOARD OF TRUSTEES DETERMINED THAT CERTAIN ADJUSTABLE BENEFITS HAD TO BE CUT IN ADDITION TO THE SURCHARGE IMPOSED ON EMPLOYERS

### A. The October 2011 Notice

Consistent with these warnings, the Board of Trustees determined that certain adjustable benefits had to be cut. *See* UFCW 0078, 0086. Section 6.04 of the Plan was formally amended to state that disability retirement benefits would be available only for Participants in pay status and receiving the benefit as of December 1, 2011.[4] UFCW 0079-80. The Plan's outside consultants determined that notice about the specific changes to Plan benefits would need to be provided to all active Plan participants. Skaric Declaration, ECF No. 27-2, ¶ 9, 10, 14. The Plan was directed to send a notice to all active Plan participants (i.e., those who had not retired as of December 31, 2010) informing them of the forthcoming changes to Plan benefits. *Id.* The Plan's consultants drafted the notice and provided instructions about to whom the notice should be sent. *Id.* The final version of the October 2011 notice was sent to the Plan's Trustees. *Id.* ¶15 & Ex. 5. The notice was then sent to 51,276 active Plan participants in October 2011. *Id.* ¶¶ 13, 15, 16-24; Zuniga Declaration, ECF No. 27-4 ¶¶ 13-15; Saribalis Declaration, ECF No. 27-5 ¶¶ 1-10; *see* UFCW 0329-0338 (October 2011 notice).

The October 2011 notice advised of changes in disability benefits, in bold print:

> Effective January 1, 2012, the Plan's Disability Retirement Benefit will no longer be available to Participants who are not already in pay status and receiving a Disability Retirement Benefit from the Fund as of December 1, 2011.

UFCW 0276, 0335. The notice further explained:

> If an eligible Participant has not yet provided the Fund with evidence of their disabled status (as determined by the Social Security Administration), even if they retired under an Early Retirement Benefit pending a disability determination, the

---

[4] Under the Plan, disability retirement benefits are paid monthly, with benefits beginning on the first of the month for those meeting eligibility requirements. UFCW 0114, 0116. Thus, any participant who was not in pay status on December 1, 2011, would not be able to be in pay status until January 1, 2012, at the earliest.

C 13-00977 LB
ORDER     4

> Participant will only be eligible to receive a Disability Retirement Benefit if (i) the Participant receives a favorable decision from the Social Security Administration on the Participant's claim by November 30, 2011, (ii) the Participant's date of entitlement to Social Security Disability benefits is no later than December 1, 2011, (iii) the Trust Fund Office receives a completed pension application (including the notification of award from the Social Security Administration) from the Participant no later than November 30, 2011, and (iv) the Participant otherwise meets the eligibility requirements for a Disability Pension under Plan rules.

UFCW 0335.

Mr. Schwarz asserts that he never received this October 2011 notice, but the Plan produced evidence demonstrating that the notice was mailed to all active participants, including Mr. Schwarz. The Plan maintains a single, master database of participant information to facilitate communications with participants, known as the Vitech database. Skaric Declaration, ECF No. 27-2 ¶¶ 5, 6 & Ex. 1. It contains the name and current address information and a full address history for all Plan participants. *Id.* The address history in the Vitech database shows that Mr. Schwarz's address has never changed since 2004, nor has any mail ever been returned as undeliverable. *Id.* ¶ 6 & Ex. 1.

As part of the Plan's regularly conducted mailing activities, the Plan routinely creates an excel spreadsheet from the Plan's Vitech database with the names and addresses of all participants to whom each mailing is sent. *Id.* ¶¶ 8, 10, 13. The Plan created a spreadsheet for the October mailing ("October 2011 Spreadsheet"), which it kept in the normal course of its mailing activities. *Id.* Mr. Schwarz's name and address was on the October 2011 Spreadsheet. Skaric Decl. ¶¶ 16-18 & Exh. 8. His address on the October 2011 Spreadsheet was listed as 2150 Mar East, Tiburon, CA 94920. *Id.* ¶ 18. The Plan then provided the October 2011 Spreadsheet to RoadRunner, the Plan's outside mailing service. Skaric Decl. ¶¶ 13, 15, 16-24. There were 52,168 participants on the list. *Id.* ¶ 18. RoadRunner ran the list of names and addresses through software containing information from the United States Postal Service to confirm that the addresses were valid and to check for bad addresses. *Id.* ¶¶ 20-21 & Ex. 10; Zuniga Declaration, ECF No. 27-4 ¶ 14. RoadRunner determined that there were 892 bad addresses. Skaric Declaration, ECF No. 27-2 ¶¶ 20-21 & Exs. 9-10. RoadRunner sent the list of all bad addresses to the Plan, which the Plan kept in the course of its normal mailing activities; Mr. Schwarz's name was not on the list. *Id.* ¶¶ 20-21 & Ex. 10; Zuniga Declaration, ECF No. 27-4 ¶ 14.

The Plan used Fontis Solutions, an outside printing service, to print the notices and deliver them to RoadRunner for mailing. Skaric Declaration, ECF No. 27-2 ¶ 16. RoadRunner confirmed that it completed the mailing for 51,276 individuals (*i.e.*, all individuals who were on the Plan's original list, except those who were on the bad address list (52,168-892 = 51,276)). *Id.* ¶¶ 22-23 & Ex. 11; Zuniga Declaration, ECF No. 27-4 ¶¶ 13, 15 & Ex. 1. RoadRunner used Pitney Bowes to pre-sort the mail and deliver it directly to the Postal Service. Zuniga Declaration, ECF No. 27-4 ¶¶ 13, 15; Saribalis Declaration, ECF No. 27-5 ¶¶ 1-10. Pitney Bowes confirmed that it in fact delivered mail from RoadRunner to the USPS during October 11-15, 2011. Zuniga Declaration, ECF No. 27-4 ¶¶ 13, 15; Saribalis Declaration, ECF No. 27-5 ¶¶ 1-10. The Plan's mailing address of P.O. Box 8086, Walnut Creek, CA 94596-8086, was used as the return address on the envelope for the October 2011 mailing. Skaric Declaration, ECF No. 27-2 ¶ 24 & Ex. 9. The Plan's records indicate that the October 2011 mailing to Mr. Schwarz was not returned to the Plan as undelivered. Skaric Declaration, ECF No. 27-2 ¶¶ 6, 24 & Ex. 1.

**B. The November 2011 Notice**

Part of the Rehabilitation Plan involved implementing a "preferred schedule" and a "default schedule" based on whether a participant's employer had adopted a memorandum of understanding or collective bargaining agreement agreeing to the changes in the Plan. UFCW 0086; 0094-0095; 0097-0098; Skaric Declaration, ECF No. 27-2 ¶¶ 9, 10, 25-26 & Ex. 12. In November 2011, the Plan's consultants determined that a second notice should be sent to participants whose employers were still on the default schedule. Skaric Declaration, ECF No. 27-2 ¶¶ 9, 10, 25-26 & Ex. 12. This November notice was sent to just 94 participants. *Id.* ¶¶ 25-32; *see* UFCW 0339-0348 (final November 2011 notice). The November notice again stated in bold print:

> Effective January 1, 2012, the Plan's Disability Retirement Benefit will no longer be available to Participants who are not already in pay status and receiving a Disability Retirement Benefit from the Fund as of December 1, 2011.

UFCW 0344. It restated the same four requirements for eligibility for the disability retirement benefit. UFCW 0345.

Mr. Schwarz asserts that he never received the November 2011 notice, but he was on the list of 94 recipients to whom the November 2011 mailing was sent. Skaric Declaration, ECF No. 27-2 ¶¶

26-28 & Ex. 14.  The Plan again used RoadRunner to complete the mailing. *Id.*; Zuniga Declaration, ECF No. 27-4 ¶¶ 13, 16, 17 & Exh. 2.  RoadRunner checked for bad addresses, and determined that none of the recipients had bad addresses.  Skaric Declaration, ECF No. 27-2 ¶ 29 & Exh. 15; Zuniga Declaration, ECF No. 27-4 ¶ 16.  RoadRunner confirmed that it completed the mailing, and delivered the mail directly to the USPS.  Skaric Declaration, ECF No. 27-2 ¶¶ 30-32; Zuniga Declaration, ECF No. 27-4 ¶¶ 13, 17 & Exh. 2.

**IV. THE PLAN GRANTED MR. SCHWARZ'S APPLICATION FOR EARLY RETIREMENT BENEFITS BUT IT DENIED HIS APPLICATION FOR DISABILITY RETIREMENT BENEFITS**

Mr. Schwarz did not apply for early retirement benefits and disability retirement benefits until December 20, 2011.  UFCW 0296, 0301.  On that day, he walked into the Plan's office in Walnut Creek, filled out a form for benefits, and simultaneously filed an appeal.  UFCW 0296, 0301, 0309.  He filled out a retirement application, and the address he listed was the same one to which the October 2011 and November 2011 notices were sent.  UFCW 0301.  And on a handwritten letter he wrote, "I did not receive the recent mailing from your office [about] . . . the changes to the pension plan."  UFCW 0296.  He stated, "I have applied for my soc[ial] sec[urity] disability benefits but have not yet received the Award."  *Id.*  He explained that he did not apply for early retirement benefits and disability retirement benefits until December 20, 2011 because he had had a hard time since undergoing two brain surgeries in 2011.  *Id.*

On February 2, 2012, Mr. Schwarz sent a letter to the Plan, again asserting that he had not received the October 2011 notice.  UFCW 0297.  He stated, "I did not receive the Mailings on the Plan Changes and sent in an Appeal on 12/20/11.  Also that was the first day that I could drive in Person to your Office after 2 x Surgery's in September, 6 Weeks IV's for Infections and 6 ½ Weeks Radiation which can cause Seizures."  *Id.*

By letter dated February 8, 2012, the Plan granted Mr. Schwarz's application for early retirement benefits in the amount of $606.59 per month, effective retroactively to January 1, 2012, but denied his application for disability retirement benefits.  UFCW 0292-0293.  The letter explained that, consistent with its rules, the disability retirement benefit was no longer available to participants who

were not already in pay status and receiving a disability retirement as of December 1, 2011. *Id.* The letter explained that under the rules of the Plan, the effective date of a disability retirement is the same as the date when a participant becomes entitled to receive Social Security disability benefits. *Id.* It then noted that, based on the records submitted to it, Mr. Schwarz would not become entitled to Social Security disability benefits until March 2012. UFCW 0292, 0303, 307. Because Mr. Schwarz was not eligible to receive disability retirement benefits from the Plan prior to the changes effective January 1, 2012, he was not eligible for disability retirement benefits. UFCW 0292. The Plan also noted that it had informed Mr. Schwarz of the change in benefits by mail in October 2011. *Id.* The Plan enclosed another copy of the October 2011 notice and informed Mr. Schwarz of his right to appeal the decision to the Board of Trustees. *Id.* The Plan's letter to Mr. Schwarz was mailed to the same address that the October 2011 Notice had been mailed. *Id.*; Skaric Declaration, ECF No. 27-2 ¶ 18.

## V. THE BOARD OF TRUSTEE'S AFFIRMED THE PLAN'S DENIAL OF MR. SCHWARZ'S APPLICATION FOR DISABILITY RETIREMENT BENEFITS

Mr. Schwarz appealed the Plan's decision. On February 13, 2012, the Plan sent a letter to Mr. Schwarz confirming that it had received his appeal for disability retirement benefits and stating that the appeal would be presented to the Board of Trustees at its meeting on February 23, 2012. UFCW 0291. The Plan invited him to provide any additional information that he would like to include in his appeal. *Id.* Mr. Schwarz did not present any additional information for the Trustees to consider besides his letters dated December 20, 2011 and February 2, 2012 asserting that he did not receive the October 2011 and November 11 notices. UFCW 0296, 0297, 0301.

A summary of Mr. Schwarz's appeal was presented to the Board of Trustees. It included his two letters dated December 20, 2011 and February 2, 2012, his retirement application, a worksheet with the hours he had worked, letters from the Social Security Administration (which were sent to him at the same address to which the October 2011 and November 2011 notices were sent), the Plan's explanation of benefits, a print-out from the benefits database, and notes on his claim. UFCW 0295-0309. The summary presented his contentions that he (1) had "been disabled since September 2011," (2) "did not receive [the Plan's] 'Important Notice of Changes in Your Benefit' document

that was mailed to all Active Participants in October 2011," and (3) was physically unable to apply for retirement benefits until December 20, 2011, due to surgeries in September 2011, subsequent complications, and follow up treatment. UFCW 0295.

On February 23, 2012, the Board of Trustees met, reviewed, and considered his appeal. UFCW 0290. By letter dated February 29, 2012, in an exercise of its discretion under the Plan, the Board of Trustees denied his appeal for the same reasons given by the Plan in its February 8, 2012 letter. *Id.*; *see* UFCW 0292-0293. The Board of Trustees's letter was sent to the same address to which the October 2011 and November 2011 notices were sent. UFCW 0290.

## VI. THE INSTANT ACTION

On March 4, 2013, Mr. Schwarz filed the instant action against the Plan, pursuant to 29 U.S.C. § 1132(a)(1)(B), to recover disability benefits to which he claims he is entitled. *See generally* Complaint, ECF No. 1. On October 15, 2013, the Plan filed a motion for summary judgment. Motion, ECF No. 27. Pursuant to the parties' agreed-upon briefing schedule, Mr. Schwarz filed an opposition on November 15, 2013, and the Plan filed a reply on December 16, 2013. Opposition, ECF No. 29 & 29-1; Reply, ECF No. 30.

## ANALYSIS

### I. LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248-49.

The party moving for summary judgment has the initial burden of informing the court of the basis for the motion and identifying those portions of the pleadings depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or

1 defense or show that the nonmoving party does not have enough evidence of an essential element to
2 carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz*
3 *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076
4 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need
5 only point out 'that there is an absence of evidence to support the nonmoving party's case.'")
6 (quoting *Celotex Corp.*, 477 U.S. at 325).

7 If the moving party meets its initial burden, the burden shifts to the non-moving party, which
8 must go beyond the pleadings and submit admissible evidence supporting its claims or defenses and
9 showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Nissan Fire*,
10 210 F.3d at 1103; *Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence
11 to show a genuine issue of material fact, the moving party is entitled to summary judgment. *See*
12 *Celotex*, 477 U.S. at 323.

13 In ruling on a motion for summary judgment, inferences drawn from the underlying facts are
14 viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith*
15 *Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. THE DENIAL OF MR. SCHWARZ'S APPLICATION FOR DISABILITY RETIREMENT BENEFITS IS REVIEWED FOR AN ABUSE OF DISCRETION

18 The standard of review for the denial of Mr. Schwarz's application for disability retirement
19 benefits is abuse of discretion. A challenge to an ERISA plan's denial of benefits under 29 U.S.C. §
20 1132(a)(1)(B) is reviewed for abuse of discretion if the plan gives the administrator discretionary
21 authority to construe the terms of the plan. *Sznewajs v. U.S. Bancorp Amended and Restated*
22 *Supplemental Benefits Plan*, 572 F.3d 727, 733 (9th Cir. 2009); *Abatie v. Alta Health & Life Ins.*
23 *Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc) (abrogated on other grounds); *see Firestone Tire &*
24 *Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). It is undisputed that discretionary authority was
25 provided by the Plan here. UFCW 0006, 0045, 0104, 0167, 0172; *see* Motion, ECF No. 27 at 18-23
26 (arguing that the standard of review is abuse of discretion); *see generally* Opposition, ECF No. 29

(failing to contest this issue).[5]

"'A plan administrator's decision to deny benefits must be upheld under the abuse of discretion standard if it is based upon a reasonable interpretation of the plan's terms and if it was made in good faith.'" *Sznewajs*, 572 F.3d 727, 734 (quoting *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1113 (9th Cir. 2000)). "'Indeed, an administrator's decision is not arbitrary unless it is not grounded on any reasonable basis.'" *Id.* at 734-35 (quoting *Hensley v. Nw. Permanente P.C. Retirement Plan & Trust*, 258 F.3d 986, 1001 (9th Cir. 2001), overruled on other grounds by *Abatie*, 458 F.3d 955). "This reasonableness standard requires deference to the administrator's benefits decision unless it is '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'" *Stephan v. Unum Life Ins. Co. of America*, 697 F.3d 917, 929 (9th Cir. 2012) (quoting *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011)).

## III. THERE IS NO GENUINE ISSUE OF MATERIAL FACT

Mr. Schwarz asserts that he never received the October 2011 and November 2011 notices from the Plan. UFCW 0296, 0297; Complaint, ECF No. 1 ¶ 6; Opposition, ECF No. 29 at 2. The Plan asserts that it mailed him both notices to the same address to which it mailed other documents to him and notes that he received those other documents just fine. Motion, ECF No. 26-29. This is a dispute of fact, but Mr. Schwarz concedes that it is not material and does not preclude granting summary judgment. Indeed, while Mr. Schwarz does reiterate in his opposition his assertion that he never received the October 2011 and November 2011 notices, nowhere in his opposition does he argue that this fact dispute prevents the court from granting the Plan's motion. *See generally* Opposition, ECF No. 29 & 29-1. Instead, he argues that the Plan needed to have mailed the notices by June 1, 2011 (an argument the court addresses below), *see id.*, ECF No. 29 at 3-4 & ECF No. 29 at 1-2, and states that whether the October 2011 and November 2011 notices were mailed is an "academic" inquiry, *id.*, ECF No. 29-1 at 2.

Mr. Schwarz nevertheless argues that the Plan has not produced "competent evidence" showing

---

[5] In light of Mr. Schwarz's failure to contest this issue, the court need not go any farther. Nevertheless, the Plan's arguments that there was no structural conflict of interest and that there were no procedural irregularities are well-taken. *See* Motion, ECF No. 27 at 21-23.

C 13-00977 LB
ORDER                                    11

UNITED STATES DISTRICT COURT
For the Northern District of California

that it mailed the October 2011 and November 2011 notices, *see id.*, ECF No. 29-1 at 2-3, but this is not true. As recounted above, the Plan submitted declarations and evidence from employees of the Plan administrator and companies that printed, sorted, and mailed the notices supporting the Plan's assertion that the notices indeed were mailed to Mr. Schwarz. *See generally* Skaric Declaration, ECF No. 27-2; Zuniga Declaration, ECF No. 27-4; Saribalis Declaration, ECF No. 27-5. This is competent evidence to support the presumption of receipt under the common law "mailbox rule," which applies in the ERISA context. *See Schikore v. BankAmerica Supplemental Retirement Plan*, 269 F.3d 956, 963-965 (9th Cir. 2001).

In any case, as the Plan points out, it does not matter whether or not Mr. Schwarz received the October 2011 and November 2011 notices or not because it is undisputed that he was not entitled to receive Social Security disability benefits by December 1, 2011, a requirement to receiving disability retirement benefits under the Plan. *See* Motion, ECF No. 27 at 26-27 (citing UFCW 0079-0080, 0292, 0295, 0335, 0345); *see also Minton v. Deloitte and Touche USA LLP Plan*, No. 09-05636 CW, 2011 WL 2181654, at *4-5 (N.D. Cal. June 3, 2011) (finding that whether the plaintiff received a required notice was not dispositive because the plaintiff failed to show that the defendant's conduct prevented him from obtaining supplemental benefits).

Accordingly, the court finds that there is no genuine issue of material fact that would preclude the court from granting the Plan's motion for summary judgment.

### IV. THE BOARD OF TRUSTEES DID NOT ABUSE ITS DISCRETION

The Plan argues that the Board of Trustees did not abuse its discretion by denying Mr. Schwarz disability retirement benefits because (1) the PPA required the Board of Trustees to modify the Plan, (2) the Board of Trustees did so in accordance with the PPA and provided notice to Plan participants, and (3) under the terms of the Plan, Mr. Schwarz was not entitled to benefits. *See* Motion, ECF No. 27 at 23-26. The court agrees with the Plan.

#### A. The PPA Required the Board of Trustees to Modify the Plan, the Board of Trustees Did So, and the Plan Provided Notice to Plan Participants

In 2006, Congress passed the PPA, which made substantial modifications to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461, to ensure the

1  long-term financial stability of pension plans. *See generally* 29 U.S.C. § 1085; *see also McGuigan*
2  *v. Local 295/Local 851 I.B.T. Employer Group Pension Plan*, No. 11-CV-2004 (JG)(MDG), 2011
3  WL 3421318, at *5 n.8 (E.D.N.Y. Aug. 4, 2011) ("Congress passed the PPA in large part to address
4  the declining financial health of single- and multi[-]employer pension plans across the country. For
5  this purpose, the PPA added new pension plan funding requirements to ERISA.") (citation omitted).
6  The PPA imposed new funding and benefit-restriction rules for multi-employer pension plans in
7  "critical status," as determined by a plan's actuary each year. *Id.* § 1085(a)(2) & (e). Critical status
8  exists when a plan's funded percentage is less than 65% and a plan projects an inability to pay
9  benefits within seven years, or a funding deficiency within five years. *Id.* § 1085(b)(2). Within 240
10 days of the certification of plan status, a plan in critical status must develop schedules of benefit
11 changes and contribution increases, as part of an overall "rehabilitation plan," to meet required
12 funding levels. *Id.* § 1085(a)(2) & (e)(1) & (3). The plan also must provide notice to plan
13 participants of such critical status and of the possibility that "adjustable benefits" "may be reduced"
14 and that "such reductions may apply to participants and beneficiaries whose benefit commencement
15 date is on or after the date such notice is provided for the fist plan year in which the plan is in critical
16 status." *Id.* § 1085(b)(3)(D). "Adjustable benefits" are defined in the PPA to include "benefits,
17 right, and features under the plan, including . . . disability benefits not yet in pay status." *Id.* §
18 1085(e)(8)(A)(iv)(I). A person is in "pay status" if "at any time during the current plan year, such
19 person is a participant or beneficiary under the plan and is paid an early, late, normal, or disability
20 retirement benefit under the plan (or a death benefit under the plan related to a retirement benefit),"
21 or "to the extent provided in regulations of the Secretary of the Treasury, such person is entitled to
22 such a benefit under the plan." *Id.* § 1085(i)(6).

23   As part of the rehabilitation plan, the PPA provides that the "plan sponsor shall . . . make any
24 reductions to adjustable benefits which the plan sponsor deems appropriate, based upon the outcome
25 of collective bargaining over the schedule or schedules provided" in other provisions of the statute,
26 subject to certain notice requirements. *Id.* § 1085(e)(8)(A)(i). A plan can make reductions to
27 benefits for any participant except those whose benefit commencement date was before the date on
28 which the plan provides notice to the participant for the initial critical year. *Id.* § 1085(e)(8)(A )(ii).

A notice of any reduction of adjustable benefits must be provided "at least 30 days before the general effective date of the reduction" for all participants and beneficiaries. *Id.* § 1085(e)(8)(C)(i). The PPA authorizes plan sponsors to make retroactive changes to plan benefits. *See Dennison v. MONY Life Ret. Income Sec. Plan for Employees*, 710 F.3d 741, 743 (7th Cir. 2013) ("A decade later, Congress, in the [PPA], authorized plan sponsors to increase a plan's lump sum discount rate by amendment to the plan, and to make the increase retroactive if they wanted."); *Wilson v. Solomon Entities Defined Benefit Pension Plan*, No. CV 12-1379 CAS, 2013 WL 1869990 at *7 n.3 (C.D. Cal. May 23, 2013) ("While such an amendment would normally violate 29 U.S.C. § 1054(g), the 'anti-cutback' provision of ERISA, the PPA expressly authorizes plan sponsors to make such a change retroactive.") (citing *Dennison*, 710 F.3d at 743).

Here, the Plan's Board of Trustees was required to adopt a rehabilitation plan. It did so, and the Plan provided adequate notice to its participants.[6] The Plan's actuary determined that the Plan was in critical status for 2010. UFCW 0267-0268. In April 2010, a notice was sent to all Plan participants informing them of the Plan's critical status. UFCW 0267-0268. The notice alerted participants that the Plan was required by federal law to adopt a Rehabilitation Plan, and specifically warned that adjustable benefits, including "Disability Retirement Benefit[s] (not yet in pay status)," might be reduced or eliminated. *Id.* This notice complied with the PPA's notice requirements. The Plan's Board of Trustees then adopted a rehabilitation plan. *See* UFCW 0078. The Plan remained in critical status for 2011. UFCW 0269-0270. In April 2011, a second notice was sent to all participants informing them of the Plan's critical status and that a Rehabilitation Plan had been adopted. *Id.* Like the April 2010 notice, the April 2011 notice specifically warned that adjustable benefits, including "Disability Retirement Benefit[s] (not yet in pay status)," might be reduced or eliminated. *Id.* The notice explained that the reductions would not affect individuals who retired before May 1, 2010. *Id.* The notice also specifically stated that reductions in benefits would apply to participants whose benefit commencement date was on or after January 1, 2012. *Id.* This notice complied with the PPA's notice requirements, too.

---

[6] The court notes that Mr. Schwarz does not appear to disagree. *See generally* Opposition, ECF No. 29.

1    After this, the Plan's Board of Trustees determined that certain adjustable benefits had to be cut.
2    *See* UFCW 0078, 0086.  Section 6.04 of the Plan was formally amended to state that disability
3    retirement benefits would be available only for Participants in pay status and receiving the benefit as
4    of December 1, 2011. UFCW 0079-80.   It provided sufficient evidence to show that it sent notices
5    to Plan participants in October 2011 and November 2011.  *See generally* Skaric Declaration, ECF
6    No. 27-2; Zuniga Declaration, ECF No. 27-4; Saribalis Declaration, ECF No. 27-5.  These notices
7    were provided at least 30 days before January 1, 2012—the general effective date of the reduction
8    for participants.  UFCW 0329-0338, 0339-0348.

9    Mr. Schwarz argues that under § 1085(e)(8)(C)(I) the "general effective date of the reduction" of
10   disability retirement benefits was July 1, 2011, not January 1, 2012.  Opposition, ECF No. 29 at 3-4
11   & ECF No. 29-1 at 1-2.  This is because any person applying for Social Security disability benefits
12   must wait five months before actually receiving those benefits.  *Id.* (citing 42 U.S.C. §
13   423(a)(1)(E)(I) & (c)(2)).  Thus, he argues that the Plan needed to have notified the participants by
14   June 1, 2011—30 days before the July 1, 2011 "general effective date of the reduction"—that it was
15   going to terminate the disability retirement benefits; the October 2011 and November 2011
16   notices—even if he did receive them—were too late, he says.  *Id.*  He argues that such a reading of §
17   1085(e)(8)(C)(I) is in accord with the Ninth Circuit's holding in *Peralta v. Hispanic Business, Inc.*,
18   419 F.3d 1064 (9th Cir. 2005).  *Id.*

19   In *Peralta*, an ERISA plan administrator cancelled a long-term disability benefit with no prior
20   notice to the plan's participants.  419 F.3d at 1067.  ERISA did not require a plan administrator to do
21   so.  *Id.* at 1070.  The participants were not notified about the cancellation until roughly three months
22   later, pursuant to ERISA's reporting and disclosure provisions.  *Id.* at 1067; *see* 29 U.S.C. §§
23   1022(a)-(b), 1024(b)(1).  One of the plan participants was injured on October 10, 2000, and she was
24   denied long-term disability benefits based on this cancellation, even though she was not notified of
25   the cancellation.  *Id.*  She sued, and the issue on appeal before the Ninth Circuit was "whether [an
26   ERISA plan] administrator has a fiduciary duty to notify participants in a timely fashion of the total
27   termination of their coverage, and whether that duty is separate from the reporting and disclosure
28   duty under 29 U.S.C. § 1024(b)(1) to notify participants of material changes and modifications."  *Id.*

C 13-00977 LB
ORDER                                      15

at 1067-68, 1070.

The Ninth Circuit held that a plan administrator does have such a fiduciary duty and that that duty was separate from ERISA's other reporting and disclosure duties. *Id.* It based its holding on ERISA's purpose and structure. *Id.* at 1070-72. It noted that ERISA seeks to "safeguard the well-being of employees and apprise them of their rights under an ERISA plan" and reasoned that, to effect this purpose, an ERISA fiduciary, such a plan administrator, has to provide "timely notice" to plan participants of the termination of their benefits. *Id.* at 1071. The Ninth Circuit also stated that the structure of ERISA supported this conclusion. *Id.* at 1071-72. It noted that the reporting and disclosure provisions, *see* 29 U.S.C. §§ 1021-1031, are set forth separately from the fiduciary duty provisions, *see* 29 U.S.C. §§ 1101-1114, which suggests that the satisfaction of one set of provisions did not necessarily mean that the other is satisfied. *Id.* In so holding, the court did not, however, decide what amount of time constitutes "timely notification": "Timely notification may in some circumstances mean prompt notification after a change has been effectuated. In other circumstances, timely notification may require prior notice." *Id.* at 1072.

The problem with Mr. Schwarz's argument is that it is not supported by the plain text of ERISA or *Peralta*. As for the text, Mr. Schwarz cites no authority for his argument that the "general effective date of the reduction" of disability retirement benefits in § 1085(e)(8)(C)(I) incorporates other statutory provisions relating to Social Security disability benefits. Section 1085(e)(8)(C)(I) says nothing about this, and, as the Plan points out, it is assumed that Congress is aware of other statutory requirements when it drafts and passes legislation. *See* Reply, ECF No. 30 at 12 (citing, *e.g.*, *Hing Sun v. Holder*, 602 F.3d 1092, 1100 (9th Cir. 2010)). What § 1085(e)(8)(C)(I) does say is that reductions to adjustable benefits cannot be made unless notice of the reduction has been given to all participants "at least 30 days before the general effective date" of that reduction. A plain reading of this language indicates that the "general effective date of the reduction" at issue here was January 1, 2012, meaning that notice must have been given by December 1, 2011, which it was.

As for *Peralta*, it is distinguishable. First, *Peralta* was decided in 2005, while the PPA was enacted in 2006. *Peralta* says nothing about the PPA or its purpose or structure. Second, the purpose of the PPA is to ensure the long-term financial stability of pension plans. *See McGuigan*,

2011 WL 3421318, at *8 ("[T]he chief purpose of the PPA was to require the trustees of pension plans in critical status to take steps to reduce payouts of adjustable benefits in order to rehabilitate the plans financially."). To impose notice that goes beyond what the PPA explicitly requires would be contrary to that purpose. *See id.* Third, unlike in *Peralta*, the statutory notice requirements are explicitly provided by the PPA. In *Peralta*, there was no explicit notice-of-cancellation requirement; this is why the Ninth Circuit had to imply "timely notice" into the statute. Here, however, the PPA explicitly requires notice to be given "at least 30 days before the general effective date" of the reduction of adjustable benefits. There is no need to imply further notice requirements when notice requirements are already provided. *See Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 112 (1st Cir. 2002) ("'[W]here ERISA itself specifies a notice requirement, courts must be especially cautious in creating additional ones.'") (quoting *Barrs v. Lockheed Martin*, 287 F.3d 202, 207 (1st Cir. 2002)).

In short, the PPA required the Board of Trustees to modify the Plan. It did so, and the Plan provided the statutorily required notice to plan participants within the time allowed. Mr. Schwarz's arguments to the contrary are not persuasive.[7]

**B. Under the Terms of the Plan, Mr. Schwarz Was Not Entitled to Benefits**

After the Plan was modified, and as explained in the October 2011 and November 2011 notices, Mr. Schwarz was eligible to receive disability retirement benefits only if he met the following requirements: (i) he received a favorable decision from the Social Security Administration on his claim by November 30, 2011; (ii) his date of entitlement to Social Security Disability benefits was no later than December 1, 2011; (iii) the Trust Fund Office received a completed pension application (including the notification of award from the Social Security Administration) from him no later than November 30, 2011; and (iv) he otherwise met the eligibility requirements for a Disability Pension under Plan rules. UFCW 0079-0080, 0335, 0345.

Mr. Schwarz did not meet three of the four eligibility requirements, so the Plan denied his

---

[7] In light of the court's conclusion that the Plan provided the notices required by the PPA and did so within the time set forth, the court rejects Mr. Schwarz's argument that the Plan acted "egregiously" by failing to follow the PPA's notice requirements. *See* Opposition, ECF No. 29-1 at 1-2 (citing *Blau v. Del Monte Corp.*, 748 F.2d 1348 (9th Cir. 1984)).

C 13-00977 LB
ORDER                                      17

application, and its Board of Trustees affirmed this decision. *See* UFCW 0290, 0292-0293. This decision was correct because Mr. Schwarz did not receive a favorable decision from the Social Security Administration until December 27, 2011, UFCW 0292, 0303, 0307; he was not entitled to receive Social Security Disability benefits until March 1, 2012, UFCW 0292, 0303, 0307; and he did not apply for benefits until December 20, 2011, UFCW 0301, 0303, 0307. Because Mr. Schwarz did not meet these requirements, the Plan reasonably and in good faith denied his application for retirement disability benefits. It did not abuse its discretion. *See Sznewajs*, 572 F.3d at 734 ("'A plan administrator's decision to deny benefits must be upheld under the abuse of discretion standard if it is based upon a reasonable interpretation of the plan's terms and if it was made in good faith.'") (quoting *McDaniel*, 203 F.3d at 1113).

Mr. Schwarz appealed this decision to the Plan's Board of Trustees on the basis that he was not able to apply prior to December 20, 2011 and that he had not received the October 2011 and November 2011 notices mailed to all Plan participants. UFCW 0295. But as explained above, given the timing of his Social Security application, he would not have been eligible for disability retirement benefits from the Plan until March 2012, meaning that he could not meet the four requirements for benefits. The Board of Trustees also chose not to create a special exception for Mr. Schwarz based on his claim that he did not receive the notices. The Board of Trustees, in construing the terms of the Plan, reasonably and in good faith denied his appeal. It did not abuse its discretion. *See Sznewajs*, 572 F.3d at 734.

## CONCLUSION

Based on the foregoing, the court **GRANTS** the Plan's motion for summary judgment.

**IT IS SO ORDERED.**

Dated: January 16, 2014

_____
LAUREL BEELER
United States Magistrate Judge